UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ES-TEE REALTY CO., LLC.,

Plaintiff,

- against -

SINA SOUMEKHIAN and STEVEN MAZER,

Defendants.

---

NOT FOR PUBLICATION
**MEMORANDUM & OPINION**

04-CV-3482 (CBA)

AMON, UNITED STATES DISTRICT JUDGE

Plaintiff Es-Tee Realty, LLC, brings this action to recover on an alleged loan guarantee signed by the defendants Sina Soumekhian and Steven Mazer. The Court presided over the trial of this action. For the reasons stated below, the Court finds that the plaintiff has failed to establish its prima facie case, and grants judgment in favor of the defendants. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court finds the following facts and reaches the conclusions of law as set forth hereafter.

## I. Jurisdiction

This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332, as the citizenship of the parties is diverse and the amount in controversy exceeds $75,000.

## II. Background and Findings of Fact

### A. The Parties

Plaintiff Es-Tee Realty LLC ("Es-Tee") is a limited liability company located in New

York. Israel Weinstock[1] ("Weinstock") is a resident of New York and is a member of Es-Tee.[2] (Trial Tr. 9, 10.) Defendants Sina Soumekhian ("Soumekhian") and Steven Mazer ("Mazer") (jointly, "Defendants") are citizens of Maryland. Soumekhian owned a kosher dairy restaurant in that state at all times relevant to this action. Third-party defendant Joseph Rosenhouse is a resident of New York and is the former Chief Executive Officer of Capri Bagel and Pizza Corp. ("Capri").

B. Founding of Capri

Until it went out of business in 2003, Capri was a producer of frozen kosher foods in Hackensack, New Jersey. Capri is not a party to this action. Morris Zakheim ("Zakheim") founded Capri along with other investors in 1997 and was the President and a director of Capri from that time at least until February 2003. (Trial Tr. at 10, 196, 318.) Zakheim or his accounting firm Zakheim Roth & Co. served as Capri's accountants throughout Capri's life. (Trial Tr. at 177.) Israel Weinstock first became involved with Capri in late 1999 or early 2000, when he contributed $500,000 to the corporation. (Trial Tr. at 57.) Third-party defendant Joseph Rosenhouse was brought into Capri in October 2000 to turn the failing company around and was

---

[1] Weinstock has what might charitably be called a checkered past. Weinstock was disbarred by the New York Supreme Court, Appellate Division, for engaging in overreaching and coercion and for improperly acquiring a property interest in the subject matter of a litigation he was conducting for a client. See In re Weinstock, 292 A.D.2d 1 (N.Y. App. Div. 1992). In addition, in the course of this trial, Weinstock admitted that he "went along with" Rosenhouse plan to place Capri's assets in a separate account so as to avoid creditors, including the IRS. (Trial Tr. 41-43, 67-68.) Weinstock's concession of this latter fraudulent conduct, together with his dubious demeanor on the stand, leads this court to conclude that Weinstock's testimony, where it conflicts with that of the Defendants, is less than credible.

[2] As explained at Part III.A, infra, Weinstock assigned the claimed rights to plaintiff Es-Tee. For the sake of consistency, the Court generally refers to the plaintiff as "Weinstock."

promoted to Chief Executive Officer in January of 2001. (Trial Tr. at 384; see Defs. Ex. A, Plan of Reorganization 26, Jan. 22, 2002 (signed by Rosenhouse as CEO of Capri).).

C. Capri's Bankruptcy

On January 16, 2001, Capri filed a voluntary petition for reorganization in the Bankruptcy Court for the Southern District of New York pursuant to Chapter 11 of the Bankruptcy Code. (Pl. Ex. 25, Voluntary Petition, Jan. 16, 2001; Def.'s Ex. S, Docket Sheet, In re Capri Bagel & Pizza Corp., No. 01-CB-10204 (Bankr. S.D.N.Y. Sept. 27, 2005).) Approximately a year later, on January 22, 2002, Capri proposed a Plan of Reorganization under which Weinstock, Zackheim and Rosenhouse would be required to make a joint equity contribution to Capri of "at least" $150,000 within five days of entry of an order confirming the plan. (Defs. Ex. A, Debtor's Plan of Reorganization, Jan, 22, 2002.) The shareholders' investment could be increased to $250,000 upon a vote of Capri's board of directors. (Id.) The Plan was signed by Joseph Rosenhouse as Capri's CEO. (Defs. Ex. A, Plan of Reorganization 26, Jan. 22, 2002.) A copy of the Plan was served on Israel Weinstock on April 25, 2002. (See Defs. Ex. A, Affidavit of Service 5, April 25, 2002.) After reorganization, 39% of Capri's stock would be owned by Zackheim, 36% by Weinstock, 10% by Rosenhouse, and the remainder would be held by certain minority shareholders not involved in the present litigation. The United States Attorney for the Southern District of New York initially objected to the plan on behalf of the Internal Revenue Service on the grounds that § 8.01 would preclude the IRS from pursuing its claim for unpaid taxes against officers and shareholders of Capri, but later withdrew this objection. (Defs. Ex. B, Government's Objs. to Plan of Reorg. at ¶ 12, May 15, 2002.) The Plan was confirmed with certain minor modifications by the Bankruptcy Court on July 25, 2002. (Defs. Ex. C, Order Confirming Plan at

¶ C, In re Capri Bagel & Pizza Corp., No. 01-CB-10204 (Bankr. S.D.N.Y. July 25, 2002).)

D. Defendants' Involvement with Capri

At some point in 2002, defendants Soumekhian and Mazer contacted Capri, hoping to have Capri manufacture frozen versions of certain foods the defendants sold through Soumekhian's kosher dairy restaurant in Maryland. The discussions soon became negotiations of a deal in which the defendants would become shareholders of Capri, indirectly acquiring Zakheim's shares. A complicated and uncertain series of transactions emerged from these negotiations.

1. The Shareholder Meeting & Escrow Agreement

First, on February 10, 2003, Capri's shareholders met and agreed that Zackheim would tender his shares to an escrow account for later transfer to Capri, that Capri would pay certain obligations on which Zackheim might be held personally liable, and that Weinstock would invest $200,000 into Capri. (Pl. Ex. 6, Minutes of the Meeting of Shareholders 1–2, Feb. 10, 2003 [hereinafter "Minutes"].) That same day, Zackheim entered into an Escrow Agreement ("the Escrow Agreement") with Capri pursuant to which he would turn his shares in Capri over to an escrow agent, who would in turn convey the shares to Capri over a period of six years, contingent upon Capri's paying all of the company's debts for which Zakheim was personally liable. (Pl. Ex. 6, Escrow Agreement at ¶ 3, Feb. 10, 2003 [hereinafter "Escrow Agreement"].) The Escrow Agreement provided that Zakheim would not be entitled to "any benefit or right of stockholders or owners" while his stock was being held pursuant to the Escrow Agreement, including specifically the right to vote on corporate matters or the right to receive dividends. (Id. at ¶ 5.) The Escrow Agreement was signed by Zakheim, Rosenhouse, and Weinstock, although a

handwritten note next to Weinstock's signature indicates that it is "to indicate shareholders' consent only." (Id.) Even though the Defendants were not a party to the Escrow Agreement, their attorney appears to have been involved in drafting it. (Trial Tr. at 618.)

2. The Agreement between Defendants, Rosenhouse and Weinstock

The following day, February 11, 2003, the Defendants, Rosenhouse, and Weinstock entered an agreement ("the Agreement") pursuant to which the Defendants and Rosenhouse agreed to guarantee personally the repayment with interest of a $250,000 loan from Weinstock to Capri. (Pl. Ex. 6, Agreement at ¶ 2, Feb. 11, 2003 [hereinafter "Agreement"].) The Agreement, which was drafted by Weinstock (Trial Tr. 59-60), provided that the loan to Capri "together with accrued interest, shall become due and payable no later than February 15, 2004." (Agreement at ¶ 2.)

The Agreement also contained a number of other provisions. In one provision, the Agreement purported to obligate Capri to execute and deliver to Weinstock a financing statement with a security agreement securing Weinstock's loan. (Id. at ¶ 3.) In another provision, the Agreement gave the Defendants and Rosenhouse an option to purchase Weinstock's shares in Capri for $20,000 per share anytime before February 15, 2006. (Id. at ¶ 5.) In yet another, Rosenhouse and Weinstock represented that Capri's aggregate liabilities did not exceed $1 million. (Id. at ¶ 7.) Finally, the Agreement specifically incorporated the Escrow Agreement into its terms. (Id. at 1 (stating Escrow Agreement is "annexed hereto and made a part hereof").)

The Agreement states that it is "by and amongst Sina Soumekhian, . . . Stephen Mazer, . . . Joseph Rosenhouse, . . . and Israel Weinstock," and is signed only by those individuals. (Agreement at 1, 4.) Notwithstanding the provisions purporting to bind Capri to repay

Weinstock's loan and deliver to him a security agreement, Capri was not a party or signatory to the Agreement. (See id.) Although Rosenhouse was an officer and shareholder of Capri, it is clear that he signed the Agreement in his personal capacity and not on behalf of Capri, as the Agreement purportedly bound him to guarantee a loan from Weinstock to Capri. Nothing in the Agreement indicated that Rosenhouse was binding Capri to the Agreement nor that he had the authority to do so. Indeed, Weinstock testified that there was no written agreement between him and Rosenhouse that indicated that Rosenhouse was accepting monies on Capri's behalf. (Trial Tr. at 131.) Likewise, although Weinstock was a shareholder of Capri, it is clear that he signed the Agreement in his personal capacity and not on behalf of Capri. Indeed, Weinstock could not have entered into the contract on Capri's behalf, as he insistently argued at trial that he never exercised any control over Capri and was a "passive investor" who had "no control over the business." (Id. at 146.)

3. The Guaranty

Weinstock testified at trial that on February 24, 2003, Rosenhouse, Soumekhian, and Mazer executed an additional "Guaranty" by which they unconditionally agreed to guarantee personally a $250,000 loan from Weinstock to Capri. (See Pl. Ex. 7, Guaranty, Feb. 24, 2003.) The Guaranty provided that in exchange for Weinstock's agreement to loan $250,000 pursuant to the Agreement "and other good and valuable consideration," Rosenhouse and the Defendants agreed to guarantee the repayment of all sums "which are or may become due" to Weinstock from Capri pursuant to the Agreement. (Pl. Ex. 7, Guaranty 1, Feb. 24, 2003.) Rosenhouse, Soumekhian and Mazer all deny having signed the Guaranty, (Trial Tr. at 436-44, 636-39, 747), which was drafted by Weinstock, (Trial Tr. at 73). Rather, they contend that they only signed a

signature page to be attached to a corrected copy of the February 11, 2003 Agreement. (Id.) Weinstock's testimony regarding the signing of the Guaranty is not credible, especially in light of the unanimous testimony to the contrary by the Defendants and Rosenhouse and the fact that the document dated February 11, 2003 contains significant typographical errors which raises doubts as to its authenticity and which should have been corrected. (See Agreement at 3-4 (repeating paragraphs 8 and 9).) The Court thus finds that the Defendants and Rosenhouse signed blank signature pages which Weinstock informed them would be attached to a revised version of the February 11, 2003 Agreement but which he in fact later attached to the Guaranty.

4. Payments made by Weinstock in February 2003

In the eighteen days following execution of the Agreement, Weinstock paid $54,880 to Bongard Creameries, a supplier and creditor of Capri, (see Rosenhouse Dep. Tr. at 55–56, Mar. 8, 2005), and transferred $100,000 to an account at HSBC held in Joseph Rosenhouse's name and on which Weinstock's signature was authorized,[3] (see Pl. Ex. 13b, HSBC Signature Card, undated; Pl. Ex. 13c, Transaction Display, Sept. 8, 2005 (showing wire transfer of $40,000 from Weinstock to HSBC account on Feb. 12, 2003); Pl. Ex. 13d, Transaction Display, Sept. 8, 2005 (showing wire transfer of $60,000 from Weinstock to HSBC account on February 19, 2003)).

Two days after the Guaranty was allegedly executed, Weinstock transferred $45,000 to

---

[3] Rosenhouse testified at trial that the monies transferred to this account were all used for the benefit of Capri and that he had set up the account at Weinstock's direction specifically to avoid creditors—including the Internal Revenue Service—in the wake of Capri's bankruptcy. (Trial Tr. 468.) Weinstock denied that he personally intended to use the account to avoid the IRS, but acknowledged that he knew that Rosenhouse had created the account for that express purpose and said that he "went along with it." (Trial Tr. at 42–43, 67–68.) Weinstock also testified that he believed Rosenhouse had set up the individual account in order to prevent Zakheim from having access to the funds. (Trial Tr. at 139.)

Rosenhouse's HSBC account. (Pl. Ex. 13f, Transaction Display, Sept. 8, 2005 (showing wire transfer of $45,000 from Weinstock to HSBC on February 26, 2003); see also Pl. Facts at ¶ 48.)

5. The Deals Fall Apart, Capri Fails, and Litigation Ensues

On March 11, 2003, Zakheim sent a letter to Rosenhouse and Weinstock notifying them that he had not "received a signed copy of the Minutes of the Meetings of Shareholders dated February 10, 2003 and the Escrow Agreement referencing the Minutes of the Shareholders dated February 11, 2003 and February 10, 2003," and that the agreements proposed in those minutes and the Escrow Agreement were cancelled "effective immediately."[4] (Defs. Ex. E, Fax from Zakheim to Rosenhouse & Weinstock, Mar. 11, 2003.) At trial, Zackheim acknowledged that the signature on the letter was his, but nevertheless disavowed the letter. (Trial Tr. at 191–94, 200.) There is no evidence that Zackheim ever delivered his shares to the escrow agent.

Approximately two weeks after Zackheim's letter, on March 26, 2003, Weinstock wrote a check to Rosenhouse for $27,000, with a memo notation of "Capri." (Pl. Ex. 8e, Chase Manhattan Bank, Check #10244, Mar. 26, 2003.) Approximately two months after Weinstock wrote that check, Capri went out of business. (Defs. Ex. G, Fax from Weinstock to Zakheim, May 28, 2003 (stating "as of May 27, 2003, Capri will no longer be in business.")

A year later, Weinstock transferred his rights and claims under the Agreement and the Guaranty to plaintiff Es-Tee Realty LLC, which initiated this suit against defendants Soumekhian and Mazer. The Defendants in turn filed a third-party complaint against Weinstock and Capri's

---

4 Zakheim testified at trial that, while the signature on the letter was indeed his, he could not say whether he wrote or sent the letter. (Trial Tr. at 192–93.) He further stated that "the context of the letter, what it was about, had no effect because the actual agreement did take place," and that he "never cancelled the transaction." (Trial Tr. at 194, 200.)

former CEO, Joseph Rosenhouse.

## III. Conclusions of Law

### A. Es-Tee Realty LLC's Standing

Rosenhouse has argued that plaintiff Es-Tee Realty LLC ("Es-Tee") failed to establish its standing to bring this lawsuit because Weinstock never clearly testified that he had assigned to Es-Tee the rights being pursued. Es-Tee argues that this claim is without merit, and has been waived because it was not raised until the closing arguments at trial.

Constitutional principles of standing generally require a plaintiff to show that he has suffered an injury in fact, that the injury is traceable to the defendant's conduct, and that the relief he requests will redress the injury. Vt. Agency of Natural Res. v. United States, 529 U.S. 765, 771 (2000). In addition, "prudential" principles of standing require that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 474 (1982) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)). The Supreme Court has held that an "assignee of a claim has standing to assert the injury in fact suffered by the assignor." Vermont Agency, 529 U.S. at 773.

Here, Rosenhouse argues that Weinstock's testimony at trial was insufficient to show that he had transferred his claim to Es-Tee Realty, LLC. However, the complaint pled the assignment, and was never contradicted by the Defendants' pleadings or in any testimony at trial. (See Amended Complaint at ¶¶ 17–18.) Moreover, the post-trial brief submitted on behalf of both Weinstock and Es-Tee Realty reaffirms these allegations and affirmatively offers that the transcript of Weinstock's trial testimony "probably should" indicate that Weinstock specifically

testified that he had transferred his legal claim to Es-Tee. (Pl. Post-Trial Br. at 21.) The Court therefore concludes that Rosenhouse's argument is without merit, and the assignment has been adequately alleged and testified to at trial to support Es-Tee's standing.

B. Weinstock's Prima Facie Case

"For a plaintiff to establish a prima facie case that it is entitled to recover on a guarantee under New York law, it must show: (1) that it is owed a debt from a third party; (2) that the defendant made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant." Chem. Bank v. Haseotes, 13 F.3d 569, 573 (2d Cir. 1994).

The Defendants and Rosenhouse have admitted to signing an Agreement in which they agreed to guarantee repayment with interest of a purported $250,000 loan from Weinstock to Capri. Weinstock alleges that he lent $226,880 to Capri pursuant to this Agreement, and that Capri never repaid the loan. From the beginning of this litigation, the Defendants strenuously challenged the genuineness of Weinstock's alleged loan by arguing that Weinstock contributed money to Capri only in satisfaction of other obligations, such as the requirements of the bankruptcy Plan of Reorganization or certain unpaid payroll taxes for which the IRS might have held Weinstock personally liable. Weinstock attempted to rebut those arguments by showing that those other obligations had been satisfied or were nonexistent, rather than by affirmatively showing that the money transfers were pursuant to a loan agreement with Capri. In so doing, Weinstock neglected to establish a critical element of his prima facie case, the existence of a loan

between Weinstock and Capri.[5] See id. at 573 (stating existence of loan element of prima facie case to collect on loan guaranty).

This Court afforded Weinstock the opportunity to submit supplemental post-trial briefing to argue how the evidence established a loan between Weinstock and Capri and to address evidence, if any, of Capri's obligation to repay Weinstock. See Es-Tee Realty Co., LLC., v. Soumekhian, No. 04-CV-3482 (E.D.N.Y. Aug. 15, 2006). For the reasons set forth below, the Court finds that Weinstock has not established that Capri was obligated to repay him $250,000, such that he has not established the existence of a debt from him to Capri. As Weinstock has failed to establish the existence of a debt, he has not made out his prima facie case, and is not entitled to recover on the guarantee.[6]

---

[5] To the extent that the Court's finding that the alleged loan did not exist rests on more direct grounds than the Defendants asserted at trial, it is because the burden is on the plaintiff to establish his prima facie case and an entitlement to the relief he seeks. See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc., 392 F.3d 520, 526–27 (2d Cir. 2004) (affirming district court's *sua sponte* finding that plaintiff failed to establish element of prima facie case because "plaintiffs necessarily consented" to trial of all elements of cause of action).

[6] In his supplemental post-trial briefings, Weinstock argues, for the first time, that the Defendants are liable not as guarantors of a loan from Weinstock to Capri but instead as primary obligors on the loan. (Pl. Supp. Post-Trial Br. at 9-11 (citing Brewster Transit Mix Corp. v. McLean, 169 A.D.2d 1036 (N.Y. App. Div. 1991) (holding that defendant was a co-obligor on a loan even though the defendant had used the word "guarantee" in the agreement).) This theory of recovery was not pled in Weinstock's Amended Complaint, nor was not asserted in Weinstock's Proposed Findings of Fact and Conclusions of Law, at trial, or in Weinstock's post-trial briefing. Weinstock cannot raise an entirely new claim or an entirely new theory of recovery against Defendants for the first time in a supplemental post-trial briefing which the Court afforded Weinstock so as to remedy a deficiency in his prima facie case. Nevertheless, the case law to which Weinstock cites is inapposite. In Brewster, the court found that "[t]here is nothing in the parties' writing which makes the corporation the primary obligor, with defendant's liability secondary to that of the corporation, accruing only after default on the part of the corporation." 169 A.D.2d at 1037. In contrast, the Agreement clearly contemplated that Capri would be the primary obligor on the loan, repaying the loan from corporate cash flow and securing the loan with corporate assets, and that Defendants and Rosenhouse would merely act as guarantors.

1. There was no agreement obligating Capri to repay Weinstock

The Court concludes that Weinstock has not carried his burden of establishing his prima facie case. Weinstock has adduced no evidence that Capri had any obligation to repay him and thus has not shown the existence of loan to Capri that might be covered by the Agreement and for which Defendants might be liable as guarantors.

The distinction between debt and other forms of corporate investment is frequently litigated in the tax context, since a corporation or its shareholders may reap tax benefits by characterizing an equity investment as a loan. In that context, courts have clearly held that "[t]he classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." Gilbert v. Commissioner, 248 F.2d 399, 402 (1957). Without deciding whether that definition applies to this case in every detail, the Court believes it clear that a loan requires, at a minimum, an obligation by the debtor to repay the money lent. In this case, there is no evidence that Capri ever had an obligation to repay Weinstock the money that he claims to have lent pursuant to the Agreement.

Neither the Agreement nor the Escrow Agreement contain any terms obligating Capri to repay funds to Weinstock. The Escrow Agreement, which is between only Zackheim and Capri, contains no discussion of loans by Weinstock. The Agreement states that it is "by and amongst

---

Thus, the Agreement provided that monthly payments would be deferred until February 15, 2004, "in view of anticipated cash flow constraints of the *Corporation*." (Agreement at ¶ 2 (emphasis added).) In addition, the Agreement provided that the loan would be secured by "the *Corporation* agree[ing] to execute and to deliver to Weinstock a UCC-1 with a security agreement." (Agreement at ¶ 3 (emphasis added).) Thus, because the Agreement indicated that Capri was the primary obligor and that the Defendants and Rosenhouse were merely guarantors, Weinstock cannot recover on his "primary obligor" theory.

Sina Soumekhian, . . . Stephen Mazer, . . . Joseph Rosenhouse, . . . and Israel Weinstock," and is signed only by those individuals. (Agreement at 1, 4.) Although certain paragraphs of the Agreement purport to bind Capri, that corporation is neither a signatory to the Agreement nor a party to it. See Part II.D.2, supra. Weinstock has produced no evidence to indicate that either he or Rosenhouse were acting on behalf of Capri when they signed the Agreement, nor that they had the authority to do so.[7] Indeed, Weinstock concedes that Rosenhouse signed the Agreement in his personal capacity. (Pl. Supp. Post-Trial Br. at 5, September 22, 2006.) Therefore, the paragraphs of the Agreement which purport to bind Capri to certain actions, such as repaying Weinstock, are not binding on Capri and are without effect.[8]

Nor is there evidence of any other agreement, either written or oral, obligating Capri to repay the funds to Weinstock. The Agreement anticipated that Weinstock would a secured interest in the corporation's assets with respect to the loan. (Agreement at ¶ 3 (purporting to require Capri to deliver "a UCC-1 with a security agreement with respect to said advance(s), to secure the said sum of $250,000").) However, there is no evidence that Capri ever executed such an instrument. Similarly, there is no evidence that Weinstock ever sought or obtained any other

---

[7] Although Rosenhouse testified that "Capri was going to pay [Weinstock] back," (Trial Tr. at 428-30), he did not testify that he signed the Agreement on behalf of Capri nor that he intended, in signing the Agreeement, to bind Capri in any way.

[8] In supplemental post-trial briefing, Weinstock first conceded that Rosenhouse signed the Agreement in his personal capacity. (Pl. Supp. Post-Trial Br. at 5). In a subsequent footnote, however, Weinstock argued that "Rosenhouse's capacity is not specified by his signature" and that "[t]here is absolutely no reason to assume he was not signing in his corporate capacity." (Id. at 8, n.2.) Notwithstanding Weinstock's contradictory statements regarding the nature of Rosenhouse's signature, the burden is on Weinstock, as plaintiff, to present affirmative evidence indicating that the Agreement bound Capri to repay the loan. Simply stating in a footnote to a post-trial brief that the Court can "assume" that Rosenhouse signed the Agreement "in a joint capacity" is insufficient to establish that Capri was bound by the Agreement.

promise of repayment from Capri or from Rosenhouse acting on Capri's behalf.

Weinstock's failure to receive a promise of repayment and a security agreement from Capri is more than a mere failure of formalities (which appear to have been commonplace at Capri). The Defendants agreed to guarantee a loan to Capri that would be secured by a lien on Capri's assets. Their liability would thus be offset by Capri's ability to repay the loans from its cash flow and, in the event that Capri failed, Weinstock's ability to attach Capri's assets pursuant to the security agreement and recover the loan amounts on a priority basis. In the absence of a loan or security agreement with Capri, the defendants would have had no such buffer against their personal liability. Indeed, when Capri finally went out of business, Weinstock brought this suit against the Defendants without making any effort whatsoever to ascertain Capri's assets and liabilities or to assert any security interest in Capri's assets. (Trial Tr. at 307-13.) Instead, he allowed Zackheim to sell Capri's assets and to use the proceeds in whatever manner Zackheim saw fit.[9] This is substantially different from the arrangement contemplated by the Loan Agreement.[10]

---

9 Zackheim testified at trial that he placed the proceeds in an escrow account to be used to repay Capri's debt to the IRS for unpaid payroll taxes, but that he had not informed the IRS of the account or the proceeds. (Trial Tr. at 210-12, 224-26.)

10 The Guaranty provides, in part, that the Defendants "waive presentment and demand for payment" of the loan. (Pl. Ex. 7, Guaranty para. 3, Feb. 24, 2003 [hereinafter, "Guaranty"].) However, the Defendants and Rosenhouse unanimously testified that they never signed the Guaranty, but simply signed blank signature pages which Weinstock told them would be attached to a revised Loan Agreement but which he in fact attached to the Guaranty. (Trial Tr. at 436-44, 636-39, 747.) The Court credits their testimony, and not Weinstock's contrary account, and finds as a matter of fact that neither Rosenhouse nor the Defendants ever signed the Guaranty. The Guaranty therefore is without effect. In any event, the Guaranty's plain language only purports to guarantee repayment of sums lent "pursuant to [the] Agreement." (Id. at ¶ 1.) Therefore, the Guaranty has no greater scope than the Agreement and does not encompass investments not covered by the Agreement.

2. Weinstock's payments to Capri constituted equity investments

The only evidence that Weinstock provides supporting his contention is his own testimony that the money that he gave to Capri in February 2003, after signing the Agreement, constituted a loan. (See Trial Tr. at 30-32, 38). However, credible evidence indicates that Weinstock's contributions to Capri represented a capital investment, not a loan.[11] Weinstock testified at trial that he promised, at the February 10th shareholders' meeting, "to *invest* $200,00 into Capri on or before April 11th, 2003." (Trial Tr. at 106-07 (emphasis added).) The minutes of that meeting indicate that "in consideration of the mutual covenants and conditions hereinafter set forth . . . Israel Weinstock . . . will *invest* $200,000 into the Corporation." (Minutes at 1-2 (emphasis added).) Weinstock also testified at trial that $200,000 that he agreed to "invest" was the same as the money that the Defendants agreed to guarantee, (Trial Tr. at 107), further confirming that the payments made to Capri were an equity investment and not a loan. However, Weinstock never argued that the Agreement could be construed to guarantee an investment other than a loan, even though the Court specifically asked the parties to address that issue in their supplemental post-trial briefs. Furthermore, it is clear from the language of the Agreement that the guarantee only applied to a loan from Weinstock and Capri and did not apply to any other type of investment.

It is also important to note that Weinstock's testimony regarding the nature of his payments to Capri was muddled and is unreliable. On direct examination, Weinstock testified that

11 There was testimony at trial that previous equity investments by shareholders had been carried on Capri's books as debt, for tax reasons. (See, e.g., Trial Tr. at 186–89.) If credited, this testimony may possibly have provided a basis for Weinstock to argue that the parties' previous course of dealing established that his contributions to Capri qualified as loans even without any acknowledgment by Capri of its obligation to repay. However, Weinstock strenuously argued at trial and in his post-trial briefing that these purported "shareholder loans" were not loans at all. (See, e.g., Trial Tr. at 808–09; Pl. Post Trial Br. at 3 n.3, Nov. 11, 2005.)

the payments that he made in Capri prior to the Agreement were partially in the form of a loan and partially in the form of equity investments. Specifically, Weinstock testified that his initial $500,000 contribution to Capri represented an equity investment in Capri and that he subsequently contributed $800,000 in the form of loans. (Trial Tr. at 57–58.) Contradicting himself on cross-examination, Weinstock testified that his initial $500,000 investment was a loan which was secured by a "U.C.C.-1" financing statement. (Trial Tr. at 310–12.) Finally, Capri's bankruptcy petition states that Weinstock held a secured claim of $250,000 against the corporation. (Pl. Ex. 25, Voluntary Petition, Schedule D, Jan. 16, 2001.)

The Court credits Weinstock's confusing and contradictory testimony to the extent that it shows that Weinstock as a general practice did not carefully differentiated between loans and equity investment. However, he did take steps to secure his loan when he was particularly concerned about repayment. Thus, Weinstock's failure to obtain the security agreement contemplated in the Agreement, or to obtain a written or oral commitment from Capri to repay the alleged $250,000 loan, suggests that the contributions he made after the shareholder meeting were equity investments and not loans. Although Weinstock may have simply neglected to obtain the commitment for repayment and the security agreement from Capri, the Court finds it more likely that Weinstock was reluctant to ask Zackheim's consent to recharacterize his investment as a loan and to commit Capri to repaying it within a year—long before Zackheim's own debts were to be paid by Capri.[12]

---

[12] Zackheim testified that he never had any discussion whatsoever with Weinstock regarding the $200,000 investment listed in the meeting minutes. (Trial Tr. at 219.) The Court finds that testimony not credible, like much of Zakheim's testimony, especially in light of Capri's well-known state of insolvency and Zackheim's contemporaneous agreement to return his shares to Capri in exchange for having Capri pay certain of his personal obligations. It is unlikely that Zackheim would have agreed to place his shares in escrow without some evidence that Capri

These facts, and the absence of any binding loan agreement with Capri, persuades the Court that the contributions that Weinstock made to Capri in February 2003 represented an equity investment pursuant to the agreement reached at the shareholders' meeting of February 10, 2003. These payments did not represent the loan contemplated by the Agreement of February 11, 2003 and were not covered by the Defendants' personal guarantee in that Agreement.

## IV. Conclusion

For the reasons discussed above, the Court finds that the plaintiff Es-Tee Realty has failed to establish a critical element of its prima facie case: namely, that Weinstock ever made a loan to Capri that would be subject to Defendants' personal guarantee contained in the Agreement. The Guaranty, which ~~in any event~~ extends only to loans made pursuant to the Agreement, is without effect because the Court does not credit Weinstock's testimony that the Defendants or Rosenhouse ever knew of the Guaranty or signed it. The Court therefore grants judgment in the Defendants' favor. Since the Defendants' claims against the third-party defendants Weinstock and Rosenhouse are contingent upon the Court finding the Defendants liable for Es-Tee's claims, the Court dismisses the third-party complaint. The Clerk of the Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
September ___, 2006

________________________

Carol Bagley Amon
United States District Judge

---

possessed the funds to uphold its end of the bargain.

These facts, and the absence of any binding loan agreement with Capri, persuades the Court that the contributions that Weinstock made to Capri in February 2003 represented an equity investment pursuant to the agreement reached at the shareholders' meeting of February 10, 2003. These payments did not represent the loan contemplated by the Agreement of February 11, 2003 and were not covered by the Defendants' personal guarantee in that Agreement.

## IV. Conclusion

For the reasons discussed above, the Court finds that the plaintiff Es-Tee Realty has failed to establish a critical element of its prima facie case: namely, that Weinstock ever made a loan to Capri that would be subject to Defendants' personal guarantee contained in the Agreement. The Guaranty, which extends only to loans made pursuant to the Agreement, is without effect because the Court does not credit Weinstock's testimony that the Defendants or Rosenhouse ever knew of the Guaranty or signed it. The Court therefore grants judgment in the Defendants' favor. Since the Defendants' claims against the third-party defendants Weinstock and Rosenhouse are contingent upon the Court finding the Defendants liable for Es-Tee's claims, the Court dismisses the third-party complaint. The Clerk of the Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
September 29, 2006

Carol Bagley Amon
United States District Judge

---

possessed the funds to uphold its end of the bargain.